1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JOHN STEINER,

                                        Plaintiff,

            v.

G. STEVEN HAMMOND, SARA
SMITH, J. DAVID KENNEY,

                                        Defendants.

No. C13-5120 RBL/KLS

**REPORT AND RECOMMENDATION**
**Noted for:  April 18, 2014**

Defendants G. Steven Hammond, J. David Kenney, and Sara Smith move for summary judgment on Plaintiff John Steiner's Eighth Amendment claims against them.  Dkt. 49.  The Court recommends that the motion be granted.

## BACKGROUND

Mr. Steiner filed an amended complaint against the Defendants regarding his medical care while he was incarcerated at Stafford Creek Corrections Center (SCCC).  Mr. Steiner alleges that the Defendants violated his Eighth Amendment rights when they denied him adequate medical care for gastroenterological issues.  Dkt. 33.   Mr. Steiner did not file any pleadings in response to the Defendants' motion.  Therefore, the facts presented below were obtained from other sworn pleadings filed by Mr. Steiner.

## STATEMENT OF FACTS

Since 1996, Mr. Steiner has experienced difficulties with severe acid reflux disease.  Dkt. 24, Declaration of John Steiner, ¶ 4.  In February 1997, a gastric emptying study showed he had "diminished emptying of his stomach and a second gastric study showed a distal esophageal

REPORT AND RECOMMENDATION - 1

stricture, hiatal hernia, and gastroesophageal reflux disease with Barrett's Esophagus." *Id.*, ¶¶ 5,6. In May 1997, Mr. Steiner underwent surgery to repair his hiatal hernia and a laproscopic Nissen Fundoplication surgical procedure to reduce his gastroesophageal reflux. *Id.*, ¶ 7. Thereafter, for the next thirteen years, Mr. Steiner was "fine" and managed symptoms of mild acid reflux with medications. *Id.*, ¶ 8.

In March 2010, Mr. Steiner reported to his SCCC medical provider complaining of abdominal pain, increased acid reflux, and difficulty swallowing food. His provider prescribed a medication for gastrointestinal disorders to go along with his Prilosec prescription. Dkt. 24, Steiner Decl., ¶ 10. In November 2010, Mr. Steiner returned to sick-call with complaints of increased abdominal pain and a small, slightly painful, lump in his upper abdomen. Over the next couple of months, his provider increased his Prilosec dosage and gave him a wedge support and Maalox to help reduce his acid reflux. His provider also gave him an abdominal support belt for his suspected hernia. *Id.*, ¶¶ 11-12. According to Dr. Sara Smith, Mr. Steiner's prescription medication was changed at this time to Omeprazole. Dkt. 49-2, Ex. 2, Declaration of Sara S. Smith, M.D.[1], ¶ 5; *id.,* Attachment B (Mr. Steiner's medical records from February 9, 2010 through April 3, 2011). On December 22, 2010, Mr. Steiner returned to see medical staff with similar complaints. He was prescribed a more frequent dose of Omeprazole and provided with a wedge for the head of his bed. Mr. Steiner was seen a number of times in the following months. *Id.*, Attachment B (Mr. Steiner's medical records from February 9, 2010 through April 3, 2011.) In February, 2011, Mr. Steiner told his provider that the medications and medical equipment were not relieving his symptoms. He was referred to Dr. David Owens, a gastroenterological specialist. Dkt. 24, ¶ 13; Dkt. 49-2, Exh. 2, Smith Decl., ¶ 5.

---

[1] The first page of Dr. Smith's declaration is at Dkt. 49-1, p. 52.

REPORT AND RECOMMENDATION - 2

1     On April 14, 2011, Mr. Steiner was seen by Dr. Owens of Gastroenterology Associates,

2 and was scheduled for an endoscopy to explore the causes of his claimed symptoms.  The

3 endoscopy found no major abnormalities, with some mild inflammation and Barrett's esophagus,

4 a condition affecting the lining of the esphogaus which is relatively common in long term

5 sufferers of gastroesophageal reflux disease (GERD), such as Mr. Steiner.  Mr. Steiner was also

6 switched from Omeprazole to Protonix in an attempt to alleviate his GERD symptoms.  Dkt. 49-

7 2, Smith Decl., Ex. 2, ¶ 6; *id.*, Attachment C.  Dr. Owens recommended a follow-up visit in July

8 2011.  Dkt. 24, Steiner Decl., ¶ 15; Exhibit C.  In a letter dated May 23, 2011 to Mr. Steiner, Dr.

9 Owens noted that his endoscopy showed "Barrett's esophagus and some mild inflammation, but

10 no infection."  Dkt. 24, at 97.

11     Mr. Steiner states that between May 2011 and March 2012, he made numerous requests

12 for care and asked that he be allowed to follow-up with Dr. Owens.  He also informed his SCCC

13 medical provider that his stomach pain was increasing and that he was beginning to have

14 difficulty swallowing his food due to the pain in his throat.  *Id.*, ¶ 16; Exhibit D.

15     Mr. Steiner's records indicate that nurses at the facility's pill line contacted Mr. Steiner's

16 medical provider because he was not picking up the Protonix medication which had been

17 recommended by Dr. Owens.  On June 16, 2011, during a clinic visit, Mr. Steiner explained that

18 he had not been taking the medicine because he did not want to stand in line to get the

19 medication and DOC policies required Protonix to be provided at pill line and not kept in the

20 cell.  Because of his refusal to follow Dr. Owens' recommended treatment plan, Mr. Steiner's

21 previously scheduled follow-up visit with Dr. Owens was cancelled in July of 2011.  On August

22 17, 2011, Mr. Steiner was seen by his medical provider and his refusal to take the prescribed

23 Protonix was again discussed and noted.  Dkt. 49-2, Smith Decl., Ex. 2, ¶ 6; *id.*, Attachment C.

REPORT AND RECOMMENDATION - 3

In mid-October 2011, Mr. Steiner returned to the SCCC clinic for follow-up care for his claims of esophageal burning and gastrointestinal discomfort.  When Mr. Steiner complained that his condition had worsened on November 23, 2011, his provider recommended another follow-up with a gastroenterologist.  This was presented to the Care Review Committee (CRC) and approved the following week.  Dkt. 49-2, Ex. 2, Smith Decl., ¶ 7.

According to Dr. G. Steven Hammond, DOC's Chief Medical Officer, the CRC is a group of DOC primary care physicians, physician assistants (PACs), and advanced registered nurse practitioners (ARNPs), constituted according to the DOC Offender Health Plan (OHP) to review the medical necessity of proposed health care within a cluster of DOC facilities.  Medical CRC meetings are convened weekly to review medical issues that arise at various DOC prisons. In some instances, providers will come to the CRC requesting the CRC's consultation on their cases. In other instances, providers present cases to the CRC in which they are requesting proposed intervention.  All final CRC decisions are made based on a simple majority vote of all CRC members who participate in the discussion.  The CRC votes to either authorize or not authorize proposed interventions.  The decision of the CRC is recorded on the Care Review Committee Report, but the individual votes of the members are not recorded.  In making recommendations, the CRC relies on the professional judgment of the medical professionals who make up the CRC concerning whether the proposed treatment is medically necessary.  In making this determination, reference is made to the OHP, which includes the Washington DOC Levels of Care Directory.  Dkt. 49-1, Ex. 1, Declaration of G. Steven Hammond, MD, Attachment A (DOC Health Services Offender Health Plan).

The OHP sets forth three Levels of Care: Level 1, care that is medically necessary, which is authorized; Level 2, care that in some cases as determined by CRC is medically necessary; and

Level 3, care that is not medically necessary and not authorized.  The conditions listed in the Levels of Care Directory are not intended to be all-inclusive; but are intended to be a guide for clinical decision-making to help ensure uniformity for decisions about common medical conditions.  Primary determinants of medical necessity, according to the OHP, are whether the treatment is "essential to life or preservation of limb" or is necessary to treat intractable pain, or is necessary to preserve the ability to perform Activities of Daily Living (ADLs).  If intervention for these purposes is not necessary at the present, a medical intervention can be authorized if it is determined to be highly likely that the proposed intervention will be required in the future in order to treat intractable pain or to preserve the ability to perform ADLs and that delay of care would make future care or intervention for intractable pain or preservation of ADLs significantly more dangerous, complicated, or significantly less likely to succeed.  Activities of daily living are defined as basic self-care activities such as feeding, dressing, and cleaning oneself.

Consultants may make recommendations that are not medically necessary as defined in the OHP. In fact, the OHP specifically lists as Level 3 care, "Consultant recommendations (including instructions and orders), when not a Level 1 intervention." When a consultant makes a recommendation, the recommendation may be referred to CRC to decide whether it is medically necessary to implement the recommendation.  If it is found to be not medically necessary, the condition is categorized as a Level 3 condition and the recommendation is denied.  *Id.*, Ex. 1, Hammond Decl., Attachment A at 15, 25.

As noted above, another follow-up with a gastroenterologist was approved by the CRC. Dkt. 49-2, Ex. 2, Smith Decl., ¶ 7.   Mr. Steiner was seen by Dr. Owens on March 5, 2012.  At this visit, Dr. Owens requested a number of lab tests and an abdominal CT scan.  *Id.,* Attachment D.  Mr. Steiner states that at the time he saw Dr. Owens in March 2012, he had lost

approximately 15 pounds and his symptoms of cramps, stomachaches, constipation, heartburn, and difficulty swallowing had increased. Dkt. 24, Steiner Decl., ¶ 17.  In a letter dated May 4, 2012 to Mr. Steiner, Dr. Owens states that he had not yet received the results of the lab work and CT scan "and cannot complete your evaluation without this information, nor can I rule out any potentially life-threatening conditions."  Dkt. 24, at 98.

The tests ordered by Dr. Owens, including the CT scan done on May 14, 2012, were performed but did not identify the cause of Mr. Steiner's claimed symptoms.  Dr. Owens noted that the CT was normal.  Dkt. 49-2, Ex. 2, Smith Decl., ¶ 7; *id.*, Attachment D.   In a letter dated May 16, 2012 to Mr. Steiner, Dr. Owens stated:  "Your recent CT Scan shows:  normal findings (no abnormalities seen)."  Dkt. 24, at 99.  Mr. Steiner acknowledges that the CT scan results were normal, although food was noted in his stomach, and that he did not have a hernia.  Dkt. 24, Steiner Decl., ¶ 19.  However, he states that his pain and symptoms continued to worsen.  *Id.*

At a follow-up visit, on July 26, 2012, Dr. Owens suggested a gastric emptying study and requested a follow-up for three months later.  Dkt. 49-2, Ex. 2, Smith Decl., ¶ 7; *id.*, Attachment D.  At this visit, Mr. Steiner reported that he was experiencing shortness of breath, dark colored stools, and that his weight had dropped down to 135 pounds.  Dkt. 24, Steiner Decl., ¶ 20.  He states that although Dr. Owens recommended that he be placed on a low-fat diet, his provider simply told him to remove foods from his tray that were not greasy or oily, but this left him with not much food to eat.  *Id.*; Dkt. 24, p. 71.

On August 13, 2012, F. Fadele, ARNP called "GI associate office to request for further intervention and clarification of gastric emptying study, whether pt. can be treated based on the fact that he has h/o gastroparesis and CT scan result noted that there was delay in food transit."  Dkt. 49-4, p. 18.  On August 16, 2012, Mr. Steiner was seen by his medical provider and

complained of further abdominal pain and weight loss.  Mr. Steiner was referred to DOC's

dietician Brent Carney for follow-up regarding the weight loss issue.  *Id.*  On August 30, 2012,

after Mr. Steiner complained that he was not able to eat solid food, Mr. Carney prescribed a four

to six week trial of a liquid diet with supplements.  Dkt. 49-2, Ex. 2, Smith Decl., ¶ 8; *id.*,

Attachment E.

Beginning on September 4, 2012, Mr. Steiner was erroneously given a pureed diet.  He

states that he wrote numerous kites to his provider stating that he was surviving on just three

Ensure drinks per day and that he was not receiving the liquid diet ordered by the dietician.  Dkt.

24, Steiner Decl., ¶ 23.  According to Dr. Smith, medical staff discovered on September 11, 2012

that kitchen staff had been giving Mr. Steiner a pureed diet and not a liquid diet and this mistake

was corrected immediately.  Dkt. 49-2, Ex. 2, Smith Decl., ¶ 8.  In a letter dated September 14,

2012 to Mr. Steiner, Dr. Owens stated that he had not yet received the results of the gastric

emptying scan and "cannot complete your evaluation without this information, nor can I rule out

any potentially life-threatening conditions."  Dkt. 24, at 100.

On October 15, 2012, Mr. Steiner had a follow-up visit with Mr. Carney.  Mr. Steiner

told him that he could not tolerate the liquid diet.  Mr. Carney switched Mr. Steiner's diet from

the liquid diet to seven Ensure beverages daily.  Dkt. 24, Steiner Decl., ¶ 26; Dkt. 49-2, Ex. 2,

Smith Decl., ¶ 8; *id.*, Attachment E.  Four days later, Mr. Steiner complained of severe

abdominal pain and was referred to his provider.  The following Monday, October 22, 2012, Mr.

Steiner was seen by his provider and admitted to SCCC inpatient unit (IPU) for observation.

After a few days in IPU, Mr. Steiner refused to participate in his care.  He refused to be

evaluated, refused his medication, demanded removal of his IV, and stated that he wanted to go

back to his unit so that he could go back to work.  During his three-day admission period, while

1   his consumption of food was being monitored, Mr. Steiner gained 3 pounds.  Mr. Steiner was

2   informed that he would be sent for a gastric emptying study soon and was discharged from the

3   IPU on October 24, 2012.   Dkt. 49-2, Ex. 2, Smith Decl., ¶ 8; *id*., Attachment E.  After Mr.

4   Steiner's admission to the IPU, medical staff began to more frequently measure and document

5   Mr. Steiner's weight.  *Id.*, ¶ 9, *id.*, Attachment A.

6          After he was discharged from the IPU, Mr. Steiner states that he started having painful

7   constipation and increased burning in his throat and stomach.  He asked to receive emergent

8   medical care.  Dkt. 24, Steiner Decl., ¶ 28.  Mr. Steiner was given a gastric emptying study on

9   November 15, 2012.  The study suggested a dumping syndrome may have been present, but Dr.

10   Owens was concerned that this did not fit the other symptoms described by Mr. Steiner and

11   requested a follow-up for January.  On December 18, 2012, Mr. Steiner had a follow-up

12   consultation with Mr. Carney.  Mr. Carney noted that Mr. Steiner had gained and maintained his

13   weight since his last visit and renewed Mr. Steiner's diet.  On January 3, 2013, Mr. Steiner was

14   again seen by his primary care provider and reported no changes in his condition.  On January

15   11, 2013, Dr. Owens authored a report that followed-up on the November gastric emptying

16   study.  He concluded that he could not identify any medical cause behind Mr. Steiner's

17   complained symptoms and stated, in part, as follows:

> He has lost 35 pounds since I first saw him on 4/14/11.  He has stopped eating
> solid food and has been living on insure [sic] since August.  He has a CT scan
> from 5/14/12 showing food in stomach, but otherwise normal.  Recent gastric
> emptying study showed rapid gastric emptying.  Labs are normal.  EGD also
> normal.  Unclear etiology.  Does have symptoms that could suggest dumping, but
> without a surgery to cause this and without diarrhea I am at a loss to explain his
> very significant symptoms and weight loss.  I would like to refer the patient to
> Swedish to Dr. Patterson who is a motility expert and hopefully he can shed some
> light on the patient's condition.

REPORT AND RECOMMENDATION - 8

Dkt. 24 at 81.  In the days after this report was written, Mr. Steiner's weight began to drop again after having been stable for months. The recommendation for a referral to a motility specialist at Swedish hospital was then presented the CRC.  Dkt. 49-2, Ex. 2, Smith Decl., ¶ 10; *id.*, Attachment F.

On January 23, 2013, the CRC convened and Scott M. Light, PA-C, presented Mr. Steiner's medical condition to the committee with a request for a consultation with a motility specialist at Swedish Hospital.  Per Mr. Light's summary, Mr. Steiner has a long history of gastrointestinal medical issues and was then reporting severe pain when taking solid food and had been on a liquid diet of Ensure supplements for several months — losing about 40 pounds in total.  Mr. Light reported Mr. Steiner's remote history of a Nissen fundoplication and gastroparesis and a more recent history of studies indicating a possible dumping syndrome (the opposite of gastroparesis) and Barrett's esophagus.  Mr. Light explained that there had been no suggestion of dilation and discussed Mr. Steiner's CT results and labs which ruled out celiac and H. pylori.  Mr. Light explained that when Mr. Steiner had started on the Ensure diet, he had been overweight and had since come into the normal weight range.  The dumping that was being recently suggested could be caused by the Ensure diet alone.  Mr. Light also read notes from the gastroenterologist and psychiatrist to the panel.  It was noted that Mr. Steiner is able to swallow many different medications without any difficulty.  Mr. Light explained that no physiological cause had been noted to explain Mr. Steiner's claimed pain and that there were no objective findings.  It was also noted that if Mr. Steiner is able to consume Ensure, he should be able to tolerate a liquid diet.  Based on the information provided, the CRC discussed the case and determined a motility specialist was not medically necessary at that time.  It was suggested that mental health work very closely with medical regarding this case.  Defendant Hammond was a

REPORT AND RECOMMENDATION - 9

voting member of the CRC during this meeting and accepted the committee's decision.
Additionally, he believes the decision made by the CRC was reasonable based on the
information presented during the meeting.  Dkt. 49-1, Ex. 1, Hammond Decl., ¶ 8.

Mr. Steiner states that on January 28, 2013, he had a painful golf ball sized lump in his
upper abdomen, which subsided after he laid down.  A few days later, he noticed the lump again
and went to medical.  He says that he was seen and his condition noted, but he was sent back to
his unit without further care.  Dkt. 28, Steiner Decl., ¶¶ 35, 36.  A medical note dated February 1,
2013 by K. Mays, RN2, notes a "4 cm x 5 cm mass painful to touch.  Provider notified with
directive to put o/f on call out next week to be seen.  Will refer to PA Light in 5 days.  O/f was
notified to contact medical if pain became worse or lump was larger."  Dkt. 49-5, p. 31.

Through February and March 2013, Mr. Steiner's condition continued to be monitored
closely by medical staff.  He was seen a number of times by his providers, though he did miss a
scheduled appointment during which blood samples were supposed to have been taken.  On
March 29, 2013, Mr. Steiner was again seen by Dr. Owens.  Dr. Owens, still unable to detect a
cause of Mr. Steiner's complaints, recommended an elective hospitalization to allow further
tests.  Dr. Smith approved Mr. Steiner's hospitalization and he was admitted to Providence St.
Peter Hospital (PSPH) in Olympia on April 8, 2013 through April 12, 2013.  While there, Mr.
Steiner was attended to by Dr. Muhammad Khan and nine different gastroenterologists, as well
as other doctors.  During his stay at PSPH, Mr. Steiner underwent a CT scan of his abdominal
area and pelvis, a CT scan of his head, and numerous blood tests.  Doctors discussed their
"extensive work-up" with Mr. Steiner and explained that they could find no cause for his
reported abdominal pain.  The doctors recommended that Mr. Steiner maximize his food intake
and nutrition, eating a bland and frequent diet.  They decided that Mr. Steiner would likely not

REPORT AND RECOMMENDATION - 10

benefit from their care in the future and provided the option that DOC "could consider referral to UW if the patient continues to decline."  Mr. Steiner was returned to SCCC on April 12, 2013 and his care continued to be monitored there.  Dkt. 49-2, Ex. 2, Smith Decl., ¶ 11; *id.*, Attachment G; Dkt. 24, Steiner Decl., ¶ 38; Dkt. 24, at 87-92.

Mr. Steiner states that he gained five pounds during his stay at the hospital (his discharge weight was 120 pounds), but since his return to SCCC he is now back down to 110 pounds.  Dkt. 24, Steiner Decl., ¶ 40.  Mr. Steiner states that he is now in constant and excruciatingly unbearable pain, he has lost over 60 pounds because the pain and inflammation in his throat and stomach makes eating solid foods to painful too tolerate, he has a chronic cough and sore throat, painful constipation and heartburn, and difficulty swallowing limits his consumption to only four Ensure drinks per day.  He also complains of dizziness, constant fatigue, hot and cold sweats, shortness of breath, and trouble breathing at night.  *Id.*, ¶ 42.  He now takes anti-anxiety medications to deal with his fear that he is going to die at any moment if he does not get care immediately.  *Id.*

On April 24, 2013, Mr. Steiner met with his psychiatrist, Dr. Michael Furst, and spoke of his on-going gastrointestinal complaints.  Dr. Furst suggested that they should explore potential psychological sources for Mr. Steiner's gastrointestinal issues because no physiological etiologies had been found.  In response, Mr. Steiner sent Dr. Furst a kite indicating that he thought Dr. Furst was minimizing his medical complaints and asked for another mental health provider.  Dr. Furst responded that he had offered to help evaluate any potential psychological causes of Mr. Steiner's weight loss and gastrointestinal issues.  Defendant Smith has been informed that Mr. Steiner will no longer see Dr. Furst if he continues to suggest such exploration.  Dkt. 49-2, Ex. 2, Smith Decl., ¶ 12; *id*., Attachment H.

REPORT AND RECOMMENDATION - 11

On May 9, 2013, a multi-disciplinary medical team meeting was held to discuss Mr. Steiner's treatment and develop a plan for his further care. The multi-disciplinary team consisted of Dr. Sara Smith, Dr. Michael Furst, Dr. Bruce Gage, Dr. J. David Kenney, PA-C Scott Light, Brent Carney, a Registered Dietician, Mr. John Dominoski, and Mr. Norman Goodenough. Dkt. 49-6, Exhibit 3, Declaration of Scott M. Light, PA-C, ¶ 3.

Scott Light is a certified physician assistant (PA-C) for DOC at the SCCC. He has been Mr. Steiner's primary care provide for the past six months. He has personally examined Mr. Steiner on numerous occasions, has discussed Mr. Steiner's condition with DOC medical staff, and has reviewed his medical files and information available in OMNI. *Id.* According to PA-C Light, during the meeting of May 9, 2013, medical staff discussed the comprehensive treatment that had been provided so far to Mr. Steiner and evaluated the options available. The medical professionals noted that Mr. Steiner's current weight was at the lower end of the normal range, but that he was not currently underweight and was not malnourished.

They developed a treatment plan to monitor and care for Mr. Steiner. The plan was to have Mr. Steiner remain in population and be encouraged to try eating solid food, but allowed to receive as many Ensure supplements as he needs. Additionally, DOC will make protein shakes available to Mr. Steiner to increase variety in his diet and supplement the Ensures. Mr. Steiner will continue to be weighed weekly and will have blood labs done monthly. If his BMI drops below 17.5 or the prealbumin level in his blood falls below 30 mg/dl, indicating malnourishment or other concerning metabolic issues, Mr. Steiner will be moved to the IPU, where medical staff will be better able to monitor Mr. Steiner's consumption of food and dietary supplements. Dkt. 49-6, Ex. 3, Light Decl., ¶ 8; Dkt. 49-2, Ex. 2, Smith Decl., ¶ 13; Ex. 2, Attachment I.

According to Dr. Smith, Body Mass Index (BMI), is a metric calculated based on a patient's height and weight and is used by medical professionals and the Centers of Disease Control (CDC), as a reliable indicator to screen patients for weight categories that may lead to health problems.  Mr. Steiner is five feet five inches tall.  Mr. Steiner's previously claimed weight of 170 pounds, would have put his BMI at 28.3, indicating that Mr. Steiner was overweight and just 10 pounds shy of being obese.  As of May 13, 2013, Mr. Steiner's weight was recorded at 111 pounds, making Mr. Steiner's current BMI equal to 18.5, which places him at the lower limits of the normal category for adults of his height. A BMI below 18.5 would put him in the category of underweight.  Mr. Steiner's weight is being monitored closely by DOC medical staff.  Dkt. 49-2, Ex. 1, Declaration of Sara Smith, M.D., ¶ 13; *id*., Attachment A.

If Mr. Steiner does not consume the prescribed shakes and supplements, staff will treat this accordingly and make sure Mr. Steiner receives the nutrition necessary for his health. The IPU has various methods available to supplement nutrition, including through a feeding tube or intravenously if such treatment becomes necessary.  If Mr. Steiner's monitored intake of food and supplements is consistent and sufficient, but he continues to lose weight, DOC may consider further GI specialty evaluation at that time.  Implementation of this plan will allow DOC to protect Mr. Steiner from harm.  According to his providers, Mr. Steiner currently has no emergent medical need and is not at immediate risk of irreparable health problems or death.  Dkt. 49-2,Ex. 2, Smith Decl., ¶ 13; Ex. 2, Attachment I; Dkt. 49-6, Ex. 3, Light Decl., ¶ 8.

Dr. Smith and PA-C Light state that they are confident in the quality of the treatment being provided to Mr. Steiner and assert that he is not in any imminent danger of harm.  Dkt. 49-2, Ex. 2, Smith Decl., ¶ 13; Dkt. 49-6, Ex. 3, Light Decl., ¶ 5, 7.  Mr. Steiner's health care providers are of the opinion that Mr. Steiner has received a level of care and diagnostic tests

which match those that would have been provided to any non-incarcerated patient in a Washington hospital. Dkt. 49-2, Ex. 2, Smith Decl., ¶ 11; Ex. 2, Attachment G; Dkt. 49-6, Ex. 3, Light Decl., ¶ 5. Rather, their concern is that Mr. Steiner has developed a psychiatric issue that is behind his medical claims. *Id.,* Ex. 2, ¶ 12; Ex. 3, ¶ 6. Mr. Steiner refuses to cooperate with the evaluation of this possibility. *Id.* Moreover, his claimed symptoms do not match his actions. For example, he claims that he cannot eat any solid foods, even blatantly refusing to try soft foods like pudding, but takes a variety of pills daily without difficulty, including larger multi-vitamins. Dkt. 49-6, Ex. 3, Light Decl., ¶ 6.

Denise Brewer, a SCCC classification counselor, states that Mr. Steiner has been employed as the H-4 Unit Porter since approximately 2010, and works a seven hour shift four days a week. Mr. Steiner is tasked with sweeping and mopping bathrooms, scrubbing showers and toilets, sweeping and mopping the top tier and stairs, and wiping down walls and windows. In the last six months, Mr. Steiner has demonstrated above average performance of his duties. Dkt. 49-6, Exhibit 4, Declaration of Denise Brewer, ¶ 3,4; *id.,* Attachments A and B.

### STANDARD OF REVIEW

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of production to demonstrate the absence of any genuine issue of material fact. Fed. R. Civ. P. 56(a); *see Devereaux v. Abbey,* 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir.2000). A nonmoving party's failure to comply with local

REPORT AND RECOMMENDATION - 14

rules in opposing a motion for summary judgment does not relieve the moving party of its affirmative duty to demonstrate entitlement to judgment as a matter of law. *Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003).

"If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  The non-moving party may not rely upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990).  A court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. San Francisco Unified School Dist.,* 237 F.3d 1026, 1031 (9th Cir. 2001).  This is true even when a party appears *pro se*.  *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007).

## DISCUSSION

### A.    Eighth Amendment Claim

Mr. Steiner claims that he is being denied constitutionally adequate medical care in violation of the Eighth and Fourteenth Amendments.  A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285 (1976).  A finding of deliberate indifference involves the examination of two elements:

REPORT AND RECOMMENDATION - 15

1   (1) the seriousness of the prisoner's medical need and (2) the nature of the defendant's responses

2   to that need.  *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir.1992), *overruled on other*

3   *grounds by WMX Technologies, Inc. v. Miller,* 104 F.3d 1133 (1997).  A "serious" medical need

4   exists if the failure to treat a prisoner's condition could lead to further injury or the "unnecessary

5   and wanton infliction of pain."  *Id.* (citing Estelle, 429 U.S. at 104).  Examples of conditions that

6   are "serious" in nature include an injury that a reasonable doctor or patient would find important

7   and worthy of comment or treatment, a medical condition that significantly affects an

8   individual's daily activities, or the existence of chronic and substantial pain.  *McGuckin*, 974

9   F.2d at 1060; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000).

10

11          If the medical needs are serious, the plaintiff must show that the defendants acted with

12  deliberate indifference to those needs.  *Estelle*, 429 U.S. at 104.  The plaintiff must demonstrate

13  that the prison medical staff knew of and disregarded an excessive risk to her health.  *Farmer v.*

14  *Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970 (1994).  "Prison officials are deliberately indifferent

15  to a prisoner's serious medical needs when they 'deny, delay, or intentionally interfere with

16  medical treatment'" or the express orders of a prisoner's prior physician for reasons unrelated to

17  the medical needs of the prisoner.  *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir.1992)

18  (*overruled on other grounds*); *Hunt v. Dental Dept*., 865 F.2d 198, 201 (9th Cir .1989) (citations

19  omitted).  In making such a showing, the plaintiff should allege a purposeful act or omission by

20  the defendant.  *McGuckin*, 974 F.2d at 1060.

21

22          Failure or refusal to provide medical care constitutes an Eighth Amendment violation

23  only under exceptional circumstances that approach failure to provide care at all.  *Shields v.*

24  *Kunkel*, 442 F.2d 409, 410 (9th Cir. 1971).  In addition, prison authorities have "wide discretion"

25  in the medical treatment afforded prisoners.  *Stiltner v. Rhay*, 371 F.2d 420, 421 (9th Cir. 1971).

26

REPORT AND RECOMMENDATION - 16

A plaintiff must show "more than a 'difference of medical opinion' as to the need to pursue one course of treatment over another …". *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir.1996).  A plaintiff must show that a course of treatment the doctors chose was medically unacceptable under the circumstances, and the plaintiff must show that they chose this course in conscious disregard of an excessive risk to the plaintiff's health. *Id.*  Similarly, a difference of opinion between a prisoner-patient and prison medical authorities regarding what treatment is proper and necessary does not give rise to an Eighth Amendment claim. *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970).

Viewing the record in the light most favorable to Mr. Steiner, the facts demonstrate that Mr. Steiner takes issue with the medical diagnosis and treatment provided to him by Defendants. However, there is no evidence that Defendants violated his Eighth Amendment rights.  The record indicates that Mr. Steiner was seen by medical personnel to address his issues each time he made any medical complaint.  Dkt. 49-2, Exhibit 2, Attachments A-I.  With regard to his complaints of pain related to eating since March 2010, Mr. Steiner has received dozens of medical care visits, various attempts at medication, many blood tests, a special wedge for his bed, numerous visits with specialist gastroenterologists, at least three personal nutritional consultations with a dietician, numerous special diets, at least three different CT scans, a gastric empty study, in-patient care and monitoring, and an elective hospitalization.  Despite this, Mr. Steiner refused to pick up his medication at times and did not follow other treatment recommendations made by his providers.  Further, when monitored, Mr. Steiner's weight loss and inability to ingest his Ensure seemed to improve greatly.  The ongoing treatment and response by the Defendants is not indicative of deliberate indifference but rather, is indicative of

REPORT AND RECOMMENDATION - 17

1  a high level of care.  Mr. Steiner's behavior in response to the treatment options he was provided

2  amounts only to a claim of difference of medical opinion, not an Eighth Amendment violation.

3          The record further shows that Mr. Steiner refused to allow his doctors to explore a

4  possible psychiatric component to his ailment.  The only treatment option denied was a request

5  for a specialty consultation at Swedish Medical Center.  After this denial of a referral to Swedish

6  Medical Center, Mr. Steiner was electively admitted to Providence Saint Peter Hospital in

7  Olympia where he was attended to by Dr. Muhammad Khan and nine different

8  gastroenterologists.  These specialists also failed to identify any medical cause for Mr. Steiner's

9  reported symptoms.  Because of those findings and Mr. Steiner's refusal to participate in an

10 evaluation of the potential psychiatric causes, DOC brought together a multi-disciplinary medical

11 team to discuss Mr. Steiner's treatment and develop a plan for his further care.  This team

12 developed and was implementing a comprehensive plan to ensure Mr. Steiner's health, up to the

13 point of Mr. Steiner's release from prison.  These facts do not support a finding that Defendants

14 were deliberately indifferent to Mr. Steiner's medical needs.

15         Because the record reflects that Defendants have provided medically acceptable care to

16 Mr. Steiner at all times relevant to his complaint, Mr. Steiner cannot show deliberate

17 indifference.  Therefore, Defendants' motion for summary judgment should be granted and all

18 claims against them dismissed with prejudice.

19 **B.      Qualified Immunity**

20         Defendants also argue that they are entitled to qualified immunity from damages.  Prison

21 officials are "shielded from liability for civil damages insofar as their conduct does not violate

22 clearly established statutory or constitutional rights of which a reasonable person would have

23 known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In analyzing a qualified immunity

REPORT AND RECOMMENDATION - 18

defense, the Court must determine: (1) whether a constitutional right would have been violated on the facts alleged, taken in the light most favorable to the party asserting the injury; and (2) whether the right was clearly established when viewed in the specific context of the case. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id*.  In analyzing a qualified immunity defense, courts are "permitted to exercise sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

As noted above, the Court finds that Mr. Steiner has failed to present a triable issue of fact as to his Eighth Amendment claims against Defendants and therefore, the Court need not further address the issue of qualified immunity.

**C.      Injunctive Relief**

Mr. Steiner was released from the Department of Corrections' custody on July 1, 2013 to field supervision.   Dkt. 43.  Therefore, the Department of Corrections is no longer responsible for Mr. Steiner's medical care and Mr. Steiner's request for injunctive relief is moot.  *See Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) (an issue becomes moot when it is impossible for a court to grant the party any effectual relief).

**CONCLUSION**

Based on the foregoing, the Court finds that Defendants' motion for summary judgment (Dkt. 49) should be **GRANTED** and all claims against them **dismissed with prejudice.**

REPORT AND RECOMMENDATION - 19

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **April 18, 2014,** as noted in the caption.

**DATED** this  1st   day of April, 2014.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 20